# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2024         Decided July 7, 2026

No. 23-7146

TRUSTEES OF THE IAM NATIONAL PENSION FUND,
APPELLEE

v.

M & K EMPLOYEE SOLUTIONS, LLC,
APPELLANT

———

Consolidated with 23-7149, 23-7150, 23-7151, 23-7153,
23-7154

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:23-cv-00991)
(No. 1:20-cv-00433)

———

*Donald J. Vogel* argued the cause for appellants. With him
on the briefs were *R. Jay Taylor, Jr.* and *James A. Eckhart*.

*Myron D. Rumeld* argued the cause for appellee. On the brief were *Neil V. Shah*, *Lucas Kowalczyk*, and *John E. Roberts.*

Before: KATSAS and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: This appeal involves pension liabilities of affiliated truck dealerships operating under the trade name M&K Truck Centers. One question presented is whether the contribution obligations of a service company operating in Summit, Illinois extended to work performed through a formally separate company operating nearby. Another question involves the amount of withdrawal liability and interest of a third service company that operated in Alsip, Illinois. A final question involves which other entities or individuals are liable for the withdrawal liability. On summary judgment, the district court ruled for the pension fund on all of these issues. We affirm in part, reverse in part, and remand for further proceedings.

I

The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, establishes a comprehensive federal scheme to ensure that employees receive benefits that their employers have promised. *See*, *e.g.*, *Nachman Corp. v. PBGC*, 446 U.S. 359, 361–62 (1980). Among other things, ERISA allows the trustees of a pension fund to sue to enforce employer contribution obligations or other terms of the underlying plan. 29 U.S.C. § 1132(a)(3).

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) amended ERISA to afford further protection

for pension funds supported by multiple employers and maintained through collective-bargaining agreements. MPPAA imposes "withdrawal liability" on employers that stop contributing to such pension funds. 29 U.S.C. § 1381(a). The amount of liability reflects the employer's share of unfunded vested benefits that the fund will have to pay out. *Id.* § 1381(b)(1). The fund calculates this amount and sets a payment schedule. *Id.* § 1399(b)(1). The employer may dispute its liability in arbitration or litigation. *Id.* §§ 1401(a)–(b), 1451(a)(1).

When an employer challenges a fund's assessment of withdrawal liability, MPPAA requires the employer to keep paying off the liability according to the fund's schedule while the challenge is pending. 29 U.S.C. § 1399(c)(2). In other words, the employer must "pay first, dispute later." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.–Pension Fund v. Centra*, 983 F.2d 495, 498 (3d Cir. 1992). If an employer defaults on these payments, the fund can accelerate the payment schedule, making the entire balance due immediately. 29 U.S.C. § 1399(c)(5). For purposes of withdrawal liability, MPPAA provides that all "trades or businesses (whether or not incorporated) which are under common control shall be treated as … a single employer." *Id.* § 1301(b)(1).

MPPAA codifies an employer's contractual obligation to contribute to a multi-employer pension plan. 29 U.S.C. § 1145. And it treats the obligation to make timely payments of withdrawal liability as one such contribution obligation. *Id.* § 1451(b). If a fund successfully sues to enforce such an obligation, it may recover the unpaid amount plus interest, liquidated damages, and attorney's fees. *Id.* § 1132(g).

4

II

A

M&K Truck Centers is a family of 28 truck dealerships in the midwestern United States. The dealerships operate through a complex web of affiliated companies owned directly or indirectly by Ronald Meyering.

In 2012, M&K acquired three Illinois dealerships in the municipalities of Alsip, Joliet, and Summit. M&K organized these dealerships as six separate limited liability companies. At each location, it created a "Sales" company to operate the dealership and an "Employee Solutions" (ES) company to hire employees and lease them to the corresponding Sales company. The Sales companies owned each site's physical assets. The ES companies, which were owned by corporate officers of other entities in the M&K network, themselves owned no substantial assets.

The three ES companies signed collective-bargaining agreements with Automobile Mechanics' Local 701 of the International Association of Machinists and Aerospace Workers (IAM). Each agreement required the signatory company to contribute to the IAM National Pension Fund for work performed by covered employees while the agreement remained in effect. Each agreement also required the company to bind itself to a Trust Agreement governing its relationship with the Fund. The collective-bargaining agreement signed by ES Summit applied by its terms to work performed at the Summit dealership or any other facility in Cook County, Illinois.

In 2013, M&K acquired another dealership in Cook County, which it refers to as its Northern Illinois dealership. As before, M&K formed companion Sales and ES companies

for this dealership. ES Northern Illinois did not sign a collective-bargaining agreement, and no other ES employer contributed to IAM's pension fund for the work performed by employees of ES Northern Illinois.

In 2017 and 2018, the ES entities terminated their respective collective-bargaining agreements and thus stopped making contributions to the IAM National Pension Fund. ES Joliet and ES Summit withdrew in 2017; these withdrawals triggered no MPPAA liability. The withdrawal of ES Alsip, at the end of 2018, did trigger MPPAA liability.

At that time, the ES entities stopped employing anyone. Shortly before, M&K had created two new entities, Laborforce, LLC and Employee Services, Inc. (ESI). Those companies employed the unionized and non-unionized workers, respectively, who had been previously employed by the ES entities. Laborforce and ESI then leased these employees to the four Sales companies.

When ES Alsip incurred its withdrawal liability, all the ES entities were owned by Chad Boucher, the Chief Financial Officer of a parent Sales company, and his wife Jodi. On the side, the Bouchers flipped houses.

B

In June 2019, the Fund assessed ES Alsip approximately $6.1 million in withdrawal liability and established a quarterly payment schedule. ES Alsip disputed the amount and pursued arbitration. Contrary to the "pay first, dispute later" rule, ES Alsip did not make quarterly payments in the meantime. In response, the Fund sued various M&K entities to enforce that obligation, and it accelerated the payment schedule to make the full balance of withdrawal liability due immediately.

Litigation and arbitration proceeded on parallel tracks for several years, as the district court recounted in detail. *Trs. of the IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC*, 694 F. Supp. 3d 54, 80–84 (D.D.C. 2023). When an arbitrator reduced the withdrawal liability to some $1.8 million, the M&K entities paid that amount. However, the district court later held that the arbitrator had erred in doing so. *Trs. of the IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC*, No. 21-cv-02152, 2022 WL 4534998 (D.D.C. Sept. 28, 2022). This Court affirmed that decision, 92 F.4th 316 (2024), and the Supreme Court in turn affirmed this Court, 146 S. Ct. 1224 (2026).

Meanwhile, the parties filed cross-motions for summary judgment. The district court granted the Fund's motion and denied the defendants' motions. The court held that because ES Summit and ES Northern Illinois were a "single employer," ES Summit was liable for delinquent contributions based on work performed at the Northern Illinois dealership while ES Summit remained bound by its collective-bargaining agreement. 694 F. Supp. 3d at 97–101. The court made several other rulings bearing on ES Alsip's withdrawal liability. In determining its outstanding balance, the court allocated the $1.8 million partial payment to interest, rather than to the withdrawal liability itself. *Id.* at 91–94. The court further held that ES Alsip owed interest at an increased rate imposed by an amendment to the Trust Agreement made after ES Alsip had terminated its collective-bargaining agreement and withdrawn from the Fund. *Id.* at 94–97. Finally, the court held that the ES entities, the Sales entities, Laborforce, ESI, and the Bouchers were jointly and severally liable for the withdrawal liability. *Id.* at 102–09.

The court entered a $13 million judgment for principal, interest, and liquidated damages. Of that amount, $1.6 million arose from ES Summit's failure to contribute to the Fund for

work performed at the ES Northern Illinois dealership, and the remaining $11.4 million arose from ES Alsip's withdrawal from the Fund. The judgment was paid in full, but it is not clear by whom.

On appeal, the defendants challenge (1) the conclusion that ES Summit owed contribution obligations for work performed at the Northern Illinois dealership, (2) the outstanding balance of ES Alsip's withdrawal liability, and (3) several other defendants' joint-and-several liability. We review *de novo* a grant or denial of summary judgment. *Maydak v. United States*, 630 F.3d 166, 174 (D.C. Cir. 2010).

## III

The district court held that ES Summit owed the Fund some $1.6 million for work performed at the Northern Illinois dealership while ES Summit remained bound by its collective-bargaining agreement. That work was performed by employees of ES Northern Illinois—a separate company that itself signed no collective-bargaining agreement. So the delinquent-contribution liability turns on whether employees of ES Northern Illinois should be deemed employees of ES Summit. In other words, it turns on whether we should disregard the legal separateness of the two companies.

### A

Addressing that question, both parties invoke a test developed by the National Labor Relations Board for extending the collective-bargaining obligations of one company to another. Under that test, courts consider whether the two companies have interrelated operations, common management, centralized control of labor relations, and common ownership. *See, e.g.*, *S. Prairie Constr. Co. v. Loc. No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 802–03 & n.3 (1976). That

test makes it much easier to disregard corporate separateness than does the analogous common-law test, which requires showing that corporate separateness was used to perpetrate fraud, illegality, or a comparable injustice. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 62–64 (1998).

We have doubts about whether the NLRB test is the right one here. For one thing, the NLRB's ability to develop its own single-employer doctrines stems from its administrative authority over the National Labor Relations Act, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974), but the Board lacks any such authority over ERISA. Moreover, courts presume that statutes preserve background common-law principles "except when a statutory purpose to the contrary is evident." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (cleaned up); *see Bestfoods*, 524 U.S. at 63. Here, Congress supplemented the common-law standard with a plaintiff-friendly rule for disregarding corporate separateness based on common control. *See* 29 U.S.C. § 1301(b)(1). But this statutory standard applies only for purposes of ERISA subchapter III, *id.*, which governs claims for withdrawal liability under MPPAA but not delinquent-contribution claims arising under other parts of ERISA, *see Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Loc. 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 726 (8th Cir. 2008). For these reasons, other courts of appeals have held that the common-law standard for disregarding corporate separateness, not the relaxed NLRB standard, governs such ERISA claims. *See, e.g.*, *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997); *United Steelworkers of Am. v. Connors Steel Co.*, 855 F.2d 1499, 1505–07 (11th Cir. 1988); *Operating Eng'rs Pension Tr. v. Reed*, 726 F.2d 513, 515 (9th Cir. 1984).

9

We will assume without deciding that the NLRB standard applies. The appropriate test for disregarding corporate separateness in this context is contestable. At least one court of appeals has applied the relaxed NLRB standard to delinquent-contribution claims under ERISA. *See Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307–09 (1st Cir. 1998). And our court has applied a version of the relaxed NLRB standard to delinquent-contribution claims involving unincorporated entities, *Flynn v. R.C. Tile*, 353 F.3d 953, 958–60 (D.C. Cir. 2004), while expressly reserving the question whether a more rigorous standard should apply "where a corporation is involved," *id.* at 958 n.\*\*\*. Of course, courts have "discretion" to look beyond forfeitures or stipulations regarding an applicable legal standard. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993). But courts also have discretion to accept contestable legal positions agreed to by the parties. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 487 (2010). Given the closeness and complexity of the legal issue that we have flagged, and the lack of any attention paid to it by the parties or the district court, we decline to consider it. Based on party-presentation principles, we will apply the NLRB test for disregarding corporate separateness without deciding whether it is the right one for delinquent-contribution claims under ERISA.

B

The delinquent-contribution claim turns on whether ES Summit and ES Northern Illinois could be properly treated as a single employer, so that employees of ES Northern Illinois were also employees of ES Summit. The district court granted summary judgment to the Fund on this claim. We hold that it was not adequately pleaded.

Federal Rule of Civil Procedure 8(a)(2) provides that the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." This requirement ensures "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The complaint must plead facts supporting a "plausible" inference that the plaintiff is entitled to relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not argue precise "legal theories" for liability, but it must set forth the "basic factual allegation[s]" supporting it. *Empagran S.A. v. F. Hoffman-LaRoche, Ltd.*, 388 F.3d 337, 341 (D.C. Cir. 2004) (per curiam) (cleaned up).

To establish liability on the delinquent-contribution claim, the Fund needed some legal basis for extending the collective-bargaining agreement signed by ES Summit to work performed by employees of ES Northern Illinois. Under the NLRB test urged by both parties and applied by the district court, that required consideration of four factors—whether those two entities had interrelated operations, common management, centralized control of labor relations, and common ownership. *See S. Prairie Constr. Co.*, 425 U.S. at 802–03 & n.3. The complaint in this case alleged only one of those elements, common ownership. J.A. 784–85. That sufficed to establish single-employer status under the control-group standard for withdrawal liability under MPPAA, 29 U.S.C. § 1301(b)(1), but this standard does not govern delinquent-contribution claims under ERISA. And the complaint nowhere alleged the other three elements for establishing single-employer status under the NLRB test. Nor did it even hint at these elements by alleging that ES Summit and ES Northern Illinois should be treated as a single employer.

The district court reasoned that the complaint did allege that each ES entity was highly integrated with its corresponding Sales entity. 694 F. Supp. 3d at 98. True enough, but that would suggest only that the two Summit entities should be treated as a single employer, or that the two Northern Illinois entities should be so treated. And taking a step back, entities that do nothing but supposedly lease employees to associated dealerships raise an eyebrow in a way that operating dealerships at different locations as separate businesses does not. In assessing the sufficiency of a pleading, we may consider "experience and common sense," *Iqbal*, 556 U.S. at 679, which suggest no apparent connection between the vertical integration of respective ES and Sales entities and the putative horizontal integration between individual ES entities.

The Fund further highlights that the complaint described the collective-bargaining agreement signed by ES Summit as covering work performed at the address of the Summit dealership and at "any subsequently opened facility in Cook County, Illinois." J.A. 802. We are confident that this provision extends only to work performed at dealerships serviced by ES Summit itself rather than, say, to work performed at Cook County dealerships operated by M&K's competitors. So the highlighted clause simply begs the question whether ES Northern Illinois was the same employer as ES Summit. The complaint makes no allegations regarding the significance of this clause and, more importantly, it alleges insufficient facts to support a plausible inference that the Summit and Northern Illinois entities should be treated as a single employer despite their status as formally separate companies under state law.

For these reasons, we reverse the grant of summary judgment to the Fund on the delinquent-contribution claim. And because the Fund advanced no other theory for applying

the collective-bargaining agreement of ES Summit to the employees of ES Northern Illinois, we reverse the denial of summary judgment to the defendants on this claim.

IV

The next set of issues concerns the amount of ES Alsip's withdrawal liability. One question involves whether a partial payment was properly credited to interest as opposed to principal, while another involves whether the Fund permissibly increased the applicable interest rate after ES Alsip had terminated its collective-bargaining agreement and ceased making contributions to the Fund.

A

In August 2021, the M&K entities paid the Fund some $1.8 million toward the outstanding withdrawal liability of ES Alsip. By that time, ES Alsip had defaulted on the installment payments initially required, the Fund had accelerated the payment schedule to make the full amount of withdrawal liability due immediately, and over $2 million in interest had already accrued. Under a July 2021 arbitral decision, the $1.8 million payment matched the full principal balance for the withdrawal liability, excluding interest. But the district court later vacated the arbitrator's decision, and the Supreme Court ultimately upheld the court's decision. *See* 146 S. Ct. at 1227–30. As a result of the vacatur, the principal amount returned to around $6.1 million pending further arbitration. On these facts, the question arises whether the $1.8 million payment, which covered neither the full principal balance of $6.1 million nor the interest already accrued, should have been credited to principal rather than interest. The Fund credited the payment to interest, the defendants challenged that decision, and the district court rejected the challenge on summary judgment. We agree with this aspect of the district court's decision.

13

The common law supplies a default rule for allocating partial payments to an interest-bearing debt. Under that rule, a creditor may first allocate a partial payment to any outstanding interest. *See Story v. Livingston*, 38 U.S. 359, 371 (1839); *Thompson v. Shepherd*, 12 D.C. (1 Mackey) 385, 391 (D.C. 1882). This principle, generally known as the United States Rule, "has been with us almost since the founding of our federal system." *Nat G. Harrison Overseas Corp. v. Am. Barge Sun Coaster*, 475 F.2d 504, 507 (5th Cir. 1973). And it governs unless there is a "clearly expressed intention by the parties to allocate payments in some other way." *Chi. Truck Drivers v. El Paso CGP Co.*, 525 F.3d 591, 604 (7th Cir. 2008) (cleaned up). Absent compounding of interest, this rule effectively causes the debtor to pay more because unpaid principal continues to generate further liability for interest.

The defendants object that ERISA displaces the United States Rule. They invoke three interest-related statutory provisions. One states that the district court, in an action by a pension fund for unpaid withdrawal liability, must award "interest" on the "unpaid" liability. 29 U.S.C. § 1132(g)(2)(B). Another states that, if a withdrawal-liability installment payment "is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made." *Id.* § 1399(c)(3). A third states that, if an employer defaults on a required installment payment, the pension fund "may require immediate payment of the outstanding amount" of withdrawal liability, "plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." *Id.* § 1399(c)(5). We fail to see how these provisions speak at all to the question whether a partial payment should be allocated to the withdrawal liability itself rather than to interest, much less speak with the requisite clarity to overcome a longstanding, settled background common-law rule.

Alternatively, the defendants argue that the parties did clearly agree to allocate the $1.8 million payment to principal rather than interest. The defendants cite a slew of documents allegedly manifesting such an agreement, including most prominently a demand letter made by the Fund in July 2021. It states that ES Alsip's "recalculated withdrawal liability" is just under $1.8 million, demands payment of that amount, and "reserves the right" to seek "interest." J.A. 5837. The defendants reason that, when they paid the precise amount denominated by the Fund as withdrawal liability rather than interest, the Fund became obliged to so allocate the payment. This overreads the demand letter, which correctly stated the liability as determined by the arbitrator but which made no commitment to allocate any partial payment—whether of that precise amount or otherwise—to the principal balance.

Finally, the defendants urge deference to the arbitrator's decision to allocate the partial payment to principal. The parties dispute whether the arbitrator had jurisdiction to address this issue. We need not resolve that question. Whether the demand letter and other written documents cited by the defendants required the Fund to apply the partial payment to principal is a question of law. *Pa. Ave. Dev. Corp. v. One Parcel of Land in D.C.*, 670 F.2d 289, 292 (D.C. Cir. 1981). And in MPPAA cases, courts review arbitrators' legal conclusions *de novo*. *United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th 730, 737 (D.C. Cir. 2022). So even if the arbitrator could have decided the payment-allocation question in the first instance, the district court correctly concluded that he decided it incorrectly.

For these reasons, we affirm the summary judgment with respect to allocating M&K's $1.8 million partial payment.

15

B

The parties next dispute what interest rate governs the withdrawal liability of ES Alsip. The collective-bargaining agreement that it signed incorporated the Fund's Trust Agreement, which required use of the interest rate charged by the Internal Revenue Service for delinquent taxes. In April 2021, the Fund trustees amended the Trust Agreement to set the annual interest rate at 18 percent. The trustees also made the amendment retroactive to May 2014, well before when ES Alsip terminated its collective-bargaining agreement, ceased making contributions to the Fund, and incurred its withdrawal liability. The district court held that this amendment applied to ES Alsip and thus increased its liability for interest on withdrawal liability. We disagree.

Collective-bargaining agreements do not create obligations that outlive the agreement unless their terms expressly indicate otherwise. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441–42 (2015); *Litton Fin. Printing Div., Inc. v. NLRB*, 501 U.S. 190, 206–07 (1991). Instead, there is a "traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'" *M & G Polymers*, 574 U.S. at 441–42 (quoting *Litton Fin.*, 501 U.S. at 207). So the key question is whether ES Alsip's collective-bargaining agreement, or the incorporated Trust Agreement, expressly gave the Fund authority to impose on the company additional interest liability after the company terminated the collective-bargaining agreement. The operative provision in the Trust Agreement stated that the agreement "may be amended in any respect from time to time by the Trustees." J.A. 1094. That provision does not expressly authorize the imposition of new liabilities after a company has terminated its collective-bargaining agreement.

The district court drew a distinction between the obligation to make pension contributions, which expired when ES Alsip terminated its collective-bargaining agreement, and the obligation to pay withdrawal liability and associated interest, which arose only at that time. 694 F. Supp. 3d at 96. We agree that the latter obligations arose and continued post-termination; MPPAA itself imposes those continuing obligations, and the Trust Agreement provisions addressed to withdrawal liability expressly incorporated MPPAA. But the interest-related obligation imposed in the Trust Agreement agreed to by ES Alsip was to pay interest on withdrawal liability "equal to the rate charged by the Internal Revenue Service for delinquent tax underpayments." J.A. 1088. That obligation was "fixed" by contract and thus survived the termination. *See Litton Fin.*, 501 U.S. at 206. And the additional obligation to pay further interest, up to an 18-percent annual rate, constituted a new liability impermissibly imposed after the collective-bargaining agreement had expired.

The Fund objects that ERISA permits it to increase interest rates regardless of any contractual relationship with ES Alsip. The statute provides that an award of interest on withdrawal liability "shall be determined by using the rate provided under the plan." 29 U.S.C. § 1132(g)(2). But it also defines multi-employer "plans" as ones "maintained pursuant to one or more collective bargaining agreements." *Id.* § 1002(37)(A)(ii). So ERISA contemplates that multi-employer pension plans reflect *agreements* between the parties. We therefore agree with the Second Circuit that, despite section 1132(g)(2), the employer must have agreed to the relevant plan document specifying an interest rate in order "[t]o impose a plan-provided interest rate" on its delinquent pension obligations. *32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 99 (2d Cir. 2019). Given that necessary contractual grounding, the *Litton*

presumption applies to disfavor the post-termination imposition of further interest obligations.

The trustees and the district court further object that the Trust Agreement assented to by ES Alsip expressly authorized the trustees to make retroactive amendments to the Agreement. *See* 694 F. Supp. 3d at 95. This is true, but beside the point. The question here is not whether an amendment can create obligations based on earlier conduct. Rather, it is whether an amendment—retroactive or otherwise—can bind a company that is no longer a party to the Trust Agreement. And for reasons already discussed, plan or trust amendments imposing additional interest obligations cannot be applied, retroactively or prospectively, to employers that terminated their collective-bargaining agreement and withdrew from their multi-employer plan prior to the amendment. *See Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 809–10 (7th Cir. 1999); *Empire State Bus Corp. v. Loc. 854 Health & Welfare Fund*, No. 21-cv-10471, 2023 WL 1966210, at *7–8 (S.D.N.Y. Feb. 13, 2023).

For these reasons, we reverse the grant of summary judgment to the Fund and the denial of summary judgment to the defendants on the interest-rate issue. On remand, the parties and district court should recalculate the interest and liquidated damages, which section 1132(g)(2)(C) keys to the assessed interest, using the rate in effect when ES Alsip terminated its collective-bargaining agreement.

V

The final set of issues concerns which entities or individuals may be held liable for the withdrawal liability. The district court determined that each Sales entity was a single employer or alter ego of its corresponding ES entity. This holding exposed each Sales entity to liability for ES Alsip's

withdrawal liability because the court had previously held, and the defendants do not contest, that the ES entities are commonly controlled and thus jointly and severally liable for the withdrawal liability. The court held Laborforce and ESI liable as successors to several of the ES entities. Finally, the court imposed liability on the Bouchers.

A

The Fund contends that these issues are all moot because the judgment has been paid in full. We disagree.

Mootness in this context depends on which co-defendant paid the judgment pending this appeal. A co-defendant that has paid a judgment may appeal to contest its own liability, which remains a live issue between that defendant and the plaintiff. *See*, *e.g.*, *In re Sealed Case*, 77 F.4th 815, 829 (D.C. Cir. 2023); *E.A. Renfroe & Co. v. Moran*, 338 F. App'x 836, 838 n.2 (11th Cir. 2009) (per curiam) (collecting cases). On the other hand, a non-paying defendant generally cannot appeal a judgment paid in full by a co-defendant, because the payment satisfies the liability of all defendants to the plaintiff, leaving no live controversy between the appealing defendant and the plaintiff. *See*, *e.g.*, *United States v. Balint*, 201 F.3d 928, 936 (7th Cir. 2000); *Ratner v. Sioux Nat. Gas Corp.*, 719 F.2d 801, 803 (5th Cir. 1983).

In this case, the record does not clearly show mootness. The party claiming mootness bears a "heavy burden" of establishing the facts necessary to prove it. *Michigan v. Long*, 463 U.S. 1032, 1042 n.8 (1983); *Honeywell Int'l, Inc. v. NRC*, 628 F.3d 568, 576 (D.C. Cir. 2010). Here, the Fund failed to satisfy that burden. The judgment in this case was paid in full but, surprisingly, neither the record nor the briefs tell us which defendant paid it. And at oral argument, counsel for the defendants indicated that the Sales entities had been

responsible for satisfying the judgment, but neither counsel was clear on the details, including whether the Sales entities actually made the payment or merely financed a payment by ES Alsip. Moreover, the district court has awarded attorney's fees against all the defendants, including for time spent specifically working up the claims against the Bouchers. *See Trs. of the IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC*, No. 20-cv-433, 2024 WL 4346291, at *9 (D.D.C. Sept. 30, 2024). There is no indication that the fee award has been paid, and if so by whom. And the parties agreed to hold the defendants' appeal of the fee award in abeyance because our decision here might impact either the appropriate amount of the fee award or the defendants against whom it could be entered. *See* Agreed Motion to Hold Case in Abeyance at 2, *Trs. of the IAM Nat'l Pension Fund v. M&K Emp. Sols., LLC*, No. 24-7169 (D.C. Cir. Nov. 11, 2024). Despite alleging mootness, the Fund has not addressed any of these issues regarding the significance of the live fee dispute. In sum, there remains uncertainty over which defendant paid the merits judgment, and our disposition of this appeal seems to bear on a live controversy over which defendants may be held liable for attorney's fees and which attorney hours might be compensable. Because the Fund has not satisfied its heavy burden to prove mootness, we proceed to the merits.

B

Applying variants of the NLRB test for disregarding corporate separateness, the district court held that each ES entity was a single employer with its corresponding Sales entity for purposes of withdrawal liability. 694 F. Supp. 3d at 102–04. This approach might have unduly favored the defendants because Congress has established a bright-line rule that an entire control group is liable as a single employer for purposes of withdrawal liability, 29 U.S.C. § 1301(b)(1), rather than

leaving the determination of single-employer status to an open-ended, four-part test. Nonetheless, we are reluctant to engage with this issue, for reasons explained above. So again, we will assume that the NLRB test supplies the proper standard for disregarding corporate separateness based on how the parties have litigated the case.

The district court correctly concluded on summary judgment that, under the NLRB standard, each ES entity was a single employer with its corresponding Sales entity. Resisting this conclusion, the defendants object that single-employer status is a fact-intensive question. Fair enough, but summary judgment was nonetheless appropriate unless there were genuine disputes of material fact—in other words, unless a trier of fact could reasonably resolve the single-employer question in the defendants' favor. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Here, there was overwhelming evidence that each ES entity—created for the sole purpose of supplying an affiliated Sales dealership with employees—was joined at the hip with that dealership.

C

The district court imposed vicarious liability on Laborforce and ESI as successors to the ES entities. 694 F. Supp. 3d at 104–06. Laborforce and ESI do not dispute the merits of that judgment. Instead, they contend that the district court lacked jurisdiction to issue it. They reason that federal-question jurisdiction under 28 U.S.C. § 1331 generally turns on whether federal law supplies the relevant cause of action, *see Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 8–9 (1983), and neither MPPAA nor ERISA creates a freestanding cause of action for successor liability.

Laborforce and ESI are correct that successor liability is not itself a cause of action. Instead, it is simply a means for

extending liability from one party to a nominally different one. *See*, *e.g.*, *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182–83 & n.5 (1973); *E. Cent. Ill. Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 961–62 (7th Cir. 2021). In that respect, it is akin to veil piercing, alter ego, single-employer tests, and other like doctrines for disregarding corporate separateness. And as the Supreme Court explained in *Peacock v. Thomas*, 516 U.S. 349 (1996), "[p]iercing the corporate veil is not itself an independent ERISA cause of action, but rather is a means of imposing liability on an underlying cause of action." *Id.* at 354 (cleaned up); *see also Prather*, 3 F.4th at 960 (same).

None of that imperiled the district court's federal-question jurisdiction. Here, the causes of action were ones created by ERISA (for delinquent contributions) and MPPAA (for withdrawal liability). These causes of action arose under federal law and thus triggered section 1331 jurisdiction. And they ran against ESI and Laborforce based on a federal-common-law rule extending to successors the substantive obligations of federal law enforced through the relevant federal causes of action. Nothing more is required to establish federal-question jurisdiction. *See Groden v. N&D Transp. Co., Inc.*, 866 F.3d 22, 30–31 (1st Cir. 2017).

Laborforce and ESI err in claiming support from *Peacock*. There, a plaintiff won an ERISA lawsuit against his former employer. 516 U.S. at 351–52. In a later suit, the plaintiff sued one of the company's officers under a veil-piercing theory for the same damages. *Id.* at 352. The Supreme Court held that the district court lacked federal-question jurisdiction in the second suit because ERISA creates no standalone claim for veil piercing or executing judgments. *Id.* at 353–54. The Court stressed that the plaintiff in the second suit had "alleged no 'underlying' violation of any provision of ERISA or an ERISA

plan." *Id.* at 354. Moreover, the plaintiff could not have done so, because he had unsuccessfully sued the officer on ERISA claims in the first lawsuit. *See id.* at 351–52. In contrast, this case does not involve an action to enforce an ERISA judgment against a new party based on claims not arising under ERISA. Instead, the Fund has invoked federal causes of action under ERISA and MPPAA, as well as a federal equitable doctrine making the claims run against Laborforce and ESI. In these circumstances, *Peacock* does not bar the exercise of federal-question jurisdiction. *See Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000) ("*Peacock* is limited … to successive litigation"); *Ellis v. All Steel Constr., Inc.*, 389 F.3d 1031, 1033–34 (10th Cir. 2004) ("it is only when an alter-ego claim is asserted in a separate judgment-enforcement proceeding that *Peacock* requires an independent basis for federal jurisdiction"). Instead, *Peacock* expressly contemplated federal-question jurisdiction over veil-piercing actions where, as here, the plaintiff "independently alleg[es] a violation of an ERISA provision or term of the plan." 516 U.S. at 354.

In any event, even if the Fund's successor-liability arguments required a separate jurisdictional basis, supplemental jurisdiction would exist. The Fund alleges that M&K formed ESI and Laborforce to insulate various of its corporate entities from the ERISA and MPPAA liabilities at issue in this case. The task of untangling the M&K entities' corporate structure lies at the crux of the case. And the successor-liability questions arise from the same core of facts as the single-employer questions bearing on the contribution and withdrawal liabilities. So, supplemental jurisdiction would exist. *See* 28 U.S.C. § 1367(a); *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 31 (2025).

D

The district court held that Chad and Jodi Boucher, who owned ES Alsip when that company incurred the withdrawal liability, were personally liable for it. 694 F. Supp. 3d at 106–09. The court applied the single-employer provision of MPPAA, which provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b)(1). On summary judgment, the district court held that the Bouchers' house-flipping operation was a trade or business under common control with ES Alsip. The parties dispute whether the house-flipping operation constituted a trade or business under section 1301(b)(1) and, if it did, whether the operation had wound down before withdrawal liability attached.

The Fund argues that the Bouchers forfeited these arguments by failing to arbitrate them. We disagree. MPPAA requires an "employer" to arbitrate "[a]ny dispute" regarding a fund's assessment of withdrawal liability. 29 U.S.C. § 1401(a). The Fund neither assessed withdrawal liability nor made any claim against the Bouchers until it filed an amended complaint adding them as defendants. Before that, there was no "dispute" for the Bouchers to arbitrate. *See Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373 (7th Cir. 1992). Moreover, the question whether a party is an "employer" is a threshold legal one that courts may determine before requiring arbitration. *See RTI Restoration Techs., Inc. v. Int'l Painters & Allied Trades Indus. Pension Fund*, 169 F.4th 140, 150 (3d Cir. 2026); *N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 645 (2d Cir. 2005). For both reasons, there was no forfeiture.

On the merits, we conclude that there are genuinely disputed factual questions regarding the Bouchers' house-flipping operation. As to their liability, we thus affirm the denial of summary judgment to the Bouchers and reverse the grant of summary judgment to the Fund.

An operation constitutes a trade or business if (1) the primary purpose for engaging in the activity is income or profit and (2) a person is involved in the activity with "continuity and regularity." *Connors v. Incoal, Inc.*, 995 F.2d 245, 250–51 & n.7 (D.C. Cir. 1993). In contrast, a sporadic activity, hobby, or "amusement diversion" does not qualify. *Id.* at 250. Relevant factors for determining whether some activity is a trade or business include whether the parties engage in the activity for several consecutive years and how they treat the activity on their tax returns. *Id.* at 253–54. The alleged "trade or business" need not be incorporated, nor must it share an "economic nexus" with the activities of the entity that incurred withdrawal liability. *Id.* at 249, 254.

The record shows the following about the Bouchers' house-flipping activity. In the two to three years before ES Alsip incurred its withdrawal liability, the Bouchers bought three houses, renovated them, sold them at a profit, and used the proceeds to buy and renovate another house. At this time, Jodi Boucher had recently retired; the Bouchers assert that she engaged in house-flipping as a hobby and that they never relied on it for income. The record is sparse on details about how long she spent working on these houses. On their tax returns, the Bouchers neither treated the sales as business gains nor sought to deduct their costs as business expenses. Moreover, Jodi had no office, separate phone line, or other property dedicated to house-flipping. The Bouchers paid $105,000 for the fourth house but, three days before ES Alsip withdrew from the Fund, sold it to another ES entity for $1. Three months

later, that entity resold the house for $192,000. Five months after that, the Bouchers organized a house-flipping LLC, which then sold five more houses at a profit over the next three years.

On these facts, we think a trier of fact could reasonably come out either way on whether the Bouchers were engaged in a trade or business before the withdrawal liability was incurred. As to primary purpose, the Bouchers acknowledge that they hoped and expected to profit from their house flipping, but other evidence indicates that their primary (not sole) purpose may have been hobby or amusement. Moreover, four sales over two years do not strike us as obviously continuous and regular, and it is substantially less than the seven or eight years of regular sales at issue in *Connors*. *See* 995 F.2d at 250 n.7, 253.

Likewise, a trier of fact could reasonably come out either way on whether the Bouchers had discontinued any house-flipping business prior to ES Alsip's withdrawal. One reasonable inference is that the Bouchers, after a sale suspiciously close to the withdrawal date for a suspiciously small $1 amount, continued their house-flipping business through the ES entities and, later, through a separate LLC established to shield themselves from liability. On the other hand, because control-group liability "is determined as of the date of the withdrawal," later-created entities cannot be part of that group. *Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC*, 706 F.3d 874, 886 (7th Cir. 2013); *see also Teamsters Pension Tr. Fund of Phila. & Vicinity v. Cent. Mich. Trucking, Inc.*, 857 F.2d 1107, 1109 (6th Cir. 1988). The Fund has not argued that we should disregard the Bouchers' post-withdrawal transactions as ones designed to evade liability. *See* 29 U.S.C. § 1392(c). And looking solely at what the Bouchers did in their personal, non-LLC capacities, a trier of fact could reasonably conclude that they ceased their own

house-flipping business in December 2018 and then established a separate LLC some eight or nine months later.

* * * *

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*So ordered.*